IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

IRON HORSE ENERGY SERVICES, INC.,

    Plaintiff/Counter-Defendant,

Case No. 1:18-cv-02554-JDB-jay

v.

SOUTHERN CONCRETE PRODUCTS, INC.,

    Defendant/Counter-Plaintiff.

SOUTHERN CONCRETE PRODUCTS, INC.,

    Third-Party Plaintiff,

v.

TC ENERGY CORPORATION and
TRANSCANADA PIPELINES LIMITED,

    Third-Party Defendants.

---

## ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

---

### *INTRODUCTION AND BACKGROUND*

On September 20, 2019, the Plaintiff, Iron Horse Energy Services, Inc. ("Iron Horse"), filed its amended complaint against the Defendant, Southern Concrete Products, Inc. ("SCP"). (Docket Entry ("D.E.") 63.) Before the Court is Defendant's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (D.E. 70), to which Plaintiff has responded (D.E. 76), and SCP has replied (D.E. 78). The motion is now ripe for disposition.

## STANDARD OF REVIEW

Rule 12(c) permits a party to move for judgment on the pleadings after the pleadings are closed. Fed. R. Civ. P. 12(c). The same review standard is applied to motions brought under Rule 12(c) as to those filed under Rule 12(b)(6). *Hindel v. Husted*, 875 F.3d 344, 346 (6th Cir. 2017). That is, courts are to "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true to determine whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019) (quoting *Doe v. Miami Univ.,* 882 F.3d 579, 588 (6th Cir. 2018)) (internal alterations and quotation marks omitted), *cert. denied*, ___ S. Ct. ___ (U.S. Jan. 13, 2020) (No. 19-409). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bullington v. Bedford Cty., Tenn.*, 905 F.3d 467, 469 (6th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## FACTS ALLEGED

The following facts are alleged in the amended pleading. In 2017, Third-Party Defendant TransCanada Corporation, or TransCanada Pipelines Limited ("TransCanada"), a Canadian corporation that builds and owns a network of pipelines for transportation of natural gas, oil, and power, planned to construct a pipeline through Cottage Grove, Tennessee. It hired non-party Exline Incorporated ("Exline"), which provides repairs and services of machinery in the United States, to serve as general contractor for the project. Exline subcontracted with Iron Horse, a specialist in the construction of concrete foundations for the installation of industrial generators, to build a foundation for a large natural gas

compressor at the site. Iron Horse then subcontracted with SCP, a producer of concrete products and services, to supply the concrete.

SCP agreed to furnish concrete in compliance with certain specifications required to provide sufficient strength to support the compressor. Iron Horse submitted to SCP concrete plant instructions and a general mix guideline, which together set out, among other things, the required specifications of a low air content target of three percent and a compression strength exceeding 6,500 pounds per square inch ("PSI"). SCP then created a mix design detailing specific materials to be used, adjusting weights and measures articulated in Iron Horse's general mix guideline to achieve the required concrete specification based on SCP's chosen materials.

On September 20, 2017, during an onsite visit to Defendant's batch plant, Iron Horse directed it to revise its original mix design to omit any air entraining admixture, as SCP's choice of superplasticizers would incorporate air into the mixture. The combination of the air resulting from the superplasticizers, in addition to an air entraining admixture, would likely result in an air content exceeding the required specifications. The following day, SCP batched the concrete at its plant, delivered it to the work site in three trucks, and began pouring it for the compressor foundation. At the batch plant, while a visual check was performed on the concrete, Defendant did not test the air content of the concrete loaded onto the first truck because it was believed unnecessary, since the approved final mix design did not contain air entrainment. The first truck was also not tested onsite, per industry standard.

Pursuant to industry standard, after approximately half the concrete on the second truck was poured, it was tested onsite for air, slump, and temperature. The first test results, obtained after the second truck pour was completed, reflected that the concrete likely had an

extremely high air content. SCP's quality control manager, Ross C. Armstrong, questioned the result because the mix design did not include an air entrainment admixture. He then tested the concrete loaded on the third truck with a second air meter, which confirmed the high air content.

At the time of this confirmation, the pour was near if not complete and Iron Horse was then unable to remove the poured concrete. Following the onsite testing and completion of the pour, SCP tested the concrete again at the batch plant, again revealing an extremely high air content exceeding the required specifications.

High air content could render the concrete defective, specifically, by negatively impacting its compression strength. This impact could not be determined, however, until later testing of the poured concrete. In this instance, the concrete specifications called for the 6,500 PSI strength to be reached at day twenty-eight after the pour.

On the twenty-eighth day, October 19, 2017,[1] a third party tested the poured concrete. The testing confirmed that the substance did not conform to specifications, as it had not reached or exceeded the required compression strength of 6,500 PSI. The next day, as a direct result of the defective nature of the concrete, Iron Horse was required to begin tearing out the foundation so that the concrete could be replaced. It immediately notified the Defendant.

On September 25, 2017, SCP advised Iron Horse that it had initiated an internal investigation into the cause of the high air content. Armstrong reported on October 3, 2017, that Defendant had determined that it was responsible for the defective concrete, specifically

---

[1] The amended complaint actually states that this occurred on October 19, 2019. (*See* D.E. 63 ¶ 23.) The Court assumes, however, that Plaintiff intended to refer to 2017.

4

stating that it was caused by "batch plant operator error" of an SCP employee at its facility. To prevent future errors, Armstrong ordered that the employee responsible no longer be permitted to batch concrete.

Plaintiff alleges that SCP breached its contractual duty by failing to provide concrete that met or exceeded the required specification. Alternatively, in the event there was no enforceable contract between the parties, Iron Horse seeks damages under the quasi-contractual theories of unjust enrichment and quantum meruit.

*JURISDICTION AND CHOICE OF LAW*

The instant matter was brought in this Court pursuant to diversity jurisdiction under 28 U.S.C. § 1332. In diversity cases, a federal district court is to apply the substantive law of the state in which it sits. *Hackney v. Lincoln Nat'l Fire Ins. Co.*, 657 F. App'x 563, 570 (6th Cir. 2016) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). This rule includes the forum state's law concerning choice of laws. *Id.* Where the parties have acquiesced that the law of a particular state applies, the courts need not address the choice of law question sua sponte. *GBJ Corp. v. Eastern Ohio Paving Co.*, 139 F.3d 1080, 1085 (6th Cir. 1998); *Yearta v. Amusements of Am., Inc.*, No. 2:17-cv-02117-SHM-jay, 2020 WL 61054, at *3 (W.D. Tenn. Jan. 6, 2020). Here, the parties are in agreement that the law of Tennessee applies. Thus, the Court will analyze their respective positions in light of Tennessee jurisprudence.

*ANALYSIS*

<u>Breach of Contract Claim.</u>

In order to succeed on a breach of contract claim in Tennessee, a plaintiff must demonstrate "the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *G.G. ex rel.*

*Johnson v. Boyd-Buchanan Sch.*, 588 S.W.3d 264, 271 (Tenn. Ct. App. 2019) (quoting *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011)), *appeal denied* (Oct. 11, 2019). Defendant does not claim in the instant motion that the amended pleading fails to properly allege these elements. Rather, it submits that, as the amended complaint concerns a sale of goods to which the Tennessee Uniform Commercial Code ("UCC") applies, it must also allege additional elements--that the goods were rejected or that Iron Horse revoked acceptance thereof.

In support of its position, SCP relies in its motion upon *Audio Visual Artistry v. Tanzer*, 403 S.W.3d 789 (Tenn. Ct. App. 2012). Tanzer, who had purchased a "smart home" system for his residence, sued the seller for breach of contract after several problems arose. *Tanzer*, 403 S.W.3d at 791. One of the questions before the court was whether the contract at issue involved goods, to which the UCC's provisions applied, or to services. *Id.* at 796-97. The court explained that the issue of whether the UCC or common-law contract principles applied "is important in terms of available warranties and the measure of damages." *Id.* at 796. Upon finding that the contract was predominantly for goods and, therefore, the UCC governed, the court, considering the issue of damages, noted that the UCC provides three options to a buyer upon the tender of nonconforming goods, including rejection, acceptance, or acceptance of any commercial unit and rejection of the remainder. *Id.* at 805. The case did not address whether these options must be pleaded, however, and therefore, offers little support for Defendant's argument.

In response, Iron Horse contends that the additional elements espoused by the Defendant simply do not exist, pointing out that courts interpreting Tennessee law have

6

concluded that "[t]he UCC does not alter the common-law definition of breach of contract."[2] *See W. Silver Recycling, Inc. v. ProTrade Steel Co., Ltd.*, No. 3:18-cv-00710, 2019 WL 3753712, at *4 n.8 (M.D. Tenn. Aug. 8, 2019) (citing *Orlowski v. Bates*. 146 F. Supp. 3d 908, 923 (W.D. Tenn. 2015)); *see also Frix v. Integrity Med. Sys., Inc.*, No. 1:16-cv-02559-STA-egb, 2017 WL 4171987, at *6-7 (W.D. Tenn. Sept. 20, 2017) (applying common-law definition of breach of contract to claim covered by UCC). However, even if the additional elements were required to state a claim for breach of contract, Plaintiff insists that the amended complaint sets forth sufficient allegations of rejection or revocation of acceptance. The Court agrees.

Under Tennessee's UCC, a purchaser of goods may reject or revoke acceptance upon a breach of contract by a seller. Tenn. Code Ann. § 47-2-711(1). Rejection of goods "must be within a reasonable time after their delivery or tender" and the buyer must "seasonably" notify the seller. Tenn. Code Ann. § 47-2-602(1). Further, "if the buyer has before rejection taken physical possession of goods . . .[,] he is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them[.]" Tenn. Code Ann. § 47-2-602(2)(b). A purchaser may revoke its earlier acceptance of goods if "the goods contain defects that substantially impair their value or reasonably undermine the buyer's confidence that they will perform the function for which they were purchased," "the defects were not known and would have been difficult for the buyer to discover," and "the revocation of acceptance occurs within a reasonable time after discovery of the defect and before any substantial change in the condition of the goods not caused by the defects." *Tanzer*, 403 S.W.3d at 805 (citing *Patton v. McHone*, 822 S.W.2d 608, 618-

---

[2] Plaintiff does not appear to disagree that the UCC applies to this case.

7

19 (Tenn. Ct. App. 1991)); *see also* Tenn. Code Ann. § 47-2-608. "Acceptance occurs when the buyer, after a reasonable opportunity to inspect the goods, signifies to the seller that the goods are conforming or that he or she will retain them in spite of their nonconformity, or fails to make an effective rejection, or does any act inconsistent with the seller's ownership." *Tanzer*, 403 S.W.3d at 806 (citing Tenn. Code Ann. § 47-2-606). "Whether a time for taking an action [under the Tennessee statute] is reasonable depends on the nature, purpose, and circumstances of the action." Tenn. Code Ann. § 47-1-205(a). "An action is taken seasonably if it is taken at or within the time agreed or, if no time is agreed, at or within a reasonable time." Tenn. Code Ann. § 47-1-205(b).

The amended complaint alleges that Plaintiff was unable to determine whether the concrete met the 6,500 PSI requirement until twenty-eight days after it was poured. Upon ascertaining that it did not, Iron Horse notified SCP of the defect. Defendant encourages the Court to conclude as a matter of law that this retention of the concrete was not reasonable and, therefore, bars Plaintiff's breach of contract claim. In doing so, SCP draws the Court's attention to *Salt Lake City Corp. v. Kasler Corp.*, 855 F. Supp. 1560 (D. Utah 1994).

In *Kasler*, the plaintiff undertook construction of an apron and connecting taxiway at the Salt Lake City, Utah, airport. *Kasler Corp.*, 855 F. Supp. at 1563. Shortly after the project was completed, airport authorities contacted Kasler, the general contractor, complaining that concrete used in the construction was beginning to crumble. *Id.* In the ensuing legal action, Kasler filed a third-party complaint against Monroc, Inc. ("Monroc"), the provider of aggregates used to make the concrete for, among other things, breach of contract based on the failure of the materials to meet the specifications of the contract as to the size of the aggregates used. *Id.* at 1563-65. In granting Monroc's motion for summary

judgment on the breach of contract claim, the district court concluded that it was undisputed that Kasler had a reasonable opportunity to inspect the aggregate and that it did not reject delivery within a reasonable time. *Id.* at 1565-66. Specifically, the court found that Kasler's acceptance of the aggregates was not induced by difficulty of discovery, as it had a reasonable opportunity to inspect the material, realize its size did not meet specifications, and reject it before it was substantially changed. *Id.* at 1566.

This case is in a different procedural posture than *Kasler*. As noted above, on a Rule 12(c) motion, the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true[.]" *See Jackson*, 925 F.3d at 806. The allegations here are that Iron Horse could not determine prior to the expiration of twenty-eight days whether the concrete delivered by SCP would reach the required 6,500 PSI strength, a circumstance unlike that present in *Kasler*. Reasonableness under the Tennessee UCC is a question for the trier of fact to decide. *See Tidy Didy Di-Deeland, Inc. v. Bristol Jeans, Inc.*, 1993 WL 209550, at *5 (Tenn. Ct. App. June 15, 1993); *Samples v. Guerdon Indus., Inc.*, 1986 WL 10922, at *4 (Tenn. Ct. App. Oct. 7, 1986). Thus, while Plaintiff's breach of contract claim may ultimately suffer the same fate as Kasler's, at this early point in the litigation, the Court finds that Iron Horse has sufficiently articulated a claim for relief.

<u>Claims for Unjust Enrichment and Quantum Meruit.</u>

Defendant seeks dismissal of these claims on the grounds that, because there is an enforceable contract between the parties in this matter, the claims cannot stand. The theories of unjust enrichment and quantum meruit are essentially the same and apply to "that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties" where one does not exist. *Paschall's, Inc. v.*

9

*Dozier*, 219 Tenn. 45, 53-54 (Tenn. 1966). Courts may impose a contract under these theories when "(1) there is no contract between the parties or a contract has become unenforceable or invalid"; and "(2) the defendant will be unjustly enriched absent a quasi-contractual obligation." *Whitehaven Comm. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998).

The Federal Rules of Civil Procedure allow for alternative pleading. *See* Fed. R. Civ. P. 8(a)(3). Alternative pleading is permitted "when, for instance, there is a dispute between the parties as to whether an express agreement exists." *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 796 (6th Cir. 2016) (quoting *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 32 F. Supp. 3d 824, 833-34 (E.D. Mich. 2014)).

In an order entered July 25, 2019, Judge Mark S. Norris, to whom this matter was previously assigned, determined that a one-page Business Account Application (the "BAA") constituted a contractually binding agreement between the parties. (*See* D.E. 34 at PageID 160.) The focus of the order was the BAA's forum selection clause, which Judge Norris found to be enforceable. SCP submits that, in light of this ruling, Plaintiff cannot continue to maintain claims for quasi-contractual relief.

In response, Iron Horse posits that the BAA does not encompass the entire agreement between the parties and that Judge Norris's order did not so find. Rather, it argues that the Defendant failed to comply with obligations contained in other documents, including the concrete plant instructions and the mix guideline. Plaintiff insists that, pending a finding by the Court as to the existence or terms of any contract governing the concrete specifications, it would be premature to dismiss the alternative claims at this time. Again, the Court agrees with the Plaintiff. SCP's request to dismiss the alternative claims is DENIED.

IT IS SO ORDERED this 9th day of March 2020.

                                                  s/ J. DANIEL BREEN
                                                  UNITED STATES DISTRICT JUDGE